## General Sessions.

## NEW-YORK, AUGUST TERM, 1808.

The Commissioners of the Almshouse  
        v.               } BASTARDY.*  
Alexander Whistelo, (a black man.)

Present, CLINTON, *Mayor.*

VAN WYCK, *Recorder.*

Mott, Bingham and Drake, *Aldermen.*

The cause came on pursuant to the adjournment.

*Vanhook,* counsel for the Commissioners of the Alms-
house, made a short opening of the case. He said the
points upon which it had been drawn into doubt, and
which occasioned the reference to the decision of this

---

* The second section under which this question arose, is as fol-
lows.

" *And be it farther enacted,* That if any woman shall be delivered
of a bastard child, which shall be chargeable, or likely to become
chargeable, to any city or town, or shall declare herself to be with
child, and that such child is likely to be born a bastard, and to be
chargeable as aforesaid, and shall in either case, in an examination
to be taken in writing upon oath, before any justice of the peace of
any city, or of any county wherein such town shall be, charge any
person with having gotten her with child, it shall be lawful for such
justice, upon application made to him by the overseers of the poor
of such city or town, or persons acting as such, or by any one of
them, to issue his warrant for the apprehending such person so
charged as aforesaid, and for bringing him before such justice, or
before any other justice of the peace of such city or county; and
the justice before whom such person shall be brought, is hereby
authorized and required to commit such person, to the house of cor-
rection, or common gaol of such city or county, unless he shall give
security to indemnify such city or town, or shall enter into a recog-
nizance with sufficient surety, with condition to appear at the next
general sessions of the peace, to be holden for such city or county,
and to abide or perform such order as shall be made in pursuance of
this act."

---

*To the Special Justices of the City and County of New-York.*—
The bearer of this note, Lucy Williams, has represented to the
Commissioners of the Almshouse, that she was delivered of a fe-

court, were two : First, whether the witness was to be believed. Secondly, whether the fact she swore to was possible. He observed that although many witnesses of learning and experience in such subjects had been called to give their opinions for the satisfaction of the court, yet he conceived it to be a matter on which technical know-

male bastard child, on the 23d day of January, 1807, and that said child has become a public charge, having been maintained near five months last in the Almshouse.

And she farther states, that Alexander Whistelo, coachman to Doctor Hosack, is the reputed father of said bastard child.

You are, therefore, hereby requested to take proper legal measures for the apprehending of Whistelo, in order that the public may be indemnified.

PHILIP I. ARCULARIUS, } <i>Commissioners of</i><br>P. BONNETT,            }  <i>the Almshouse.</i>

Almshouse, June 8, 1808.

*City of New-York, ss.*—The voluntary examination of Lucy Williams, a yellow woman, taken on oath before me, Jacob de la Montagnie, one of the special Justices for preserving the peace in the city of New-York, this eighth day of June, 1808, who saith that on the twenty-third day of January, 1807, at the city of New-York, she was delivered of a female bastard child, which said child is now chargeable to the city and county of New-York, and that Alexander Whistelo, a coachman to Doctor Hosack, did get her with child of the said bastard.

her<br>LUCY &#8904; WILLIAMS.<br>mark.

Taken before me this 8th day of June, 1808.

J. DE LA MONTAGNIE, Special Justice.

*City and County of New-York, ss.*—By Jacob de la Montaigne and Joshua Barker, Special Justices for preserving the peace in the city of New-York :—To the Marshals and Constables of the said city, and every of them, greeting :—Whereas complaint has been made to us, by the Commissioners of the Almshouse and Bridewell of the city aforesaid, they being the overseers of the poor of the said city, that a certain female bastard child, of which Lucy Williams of the said city, was on the third day of January, 1807, at the city aforesaid delivered, has become chargeable to the city and county of New-York, and that the same is likely to continue so, and also that Alexander Whistelo of the said city, coachman, is said to be the reputed father of the said child. These are, therefore, in the name of the people of the state of New-York, to command and authorize you the said constables and marshals, and every of you, to summon the said Alexander Whistelo personally to be and appear before us at the police office, in the City-Hall of the city of New-York, on Friday the tenth day of June inst. at four o'clock in the afternoon of that day ; then and there to show cause, if any he has, why he should not be adjudged to be the reputed father of the said child. And farther, to do and receive in the pre-

NEW-YORK, 1808.

Commissioners of the Almshouse

v.

Whistelo.

ledge could not throw much light ; and that each of the members who composed the court were as well able to form a correct opinion as any professional man whatever. The woman had already sworn positively ; and

mises what shall then and there be adjudged concerning him, &c. Given at the Police-office, in the City-Hall of the city of New-York, this ninth day of June, 1801.

JOSHUA BARKER,
J. DE LA MONTAGNIE.

June 10th, 1808. Four o'clock,P. M. parties meet, and cause is adjourned until four o'clock, P. M. on Tuesday next the 14th instant.

June 14th, 1808. Parties meet, and cause is adjourned until four o'clock to-morrow afternoon.

June 15th, 1808. Richard Furman being examined by consent of parties beforetime adjourned, says, that on a certain occasion the above named Lucy Williams and Alexander Whistelo were both at the Almshouse, where the said Lucy had a child, which she there asserted to be her child, and that the said Alexander was the father of the said child. That the said child appeared to him to be the child of a white man, and does not believe that the said child was the child of the said Alexander Whistelo.

RICH. FURMAN.

Sworn before me this 15th day of June, 1808.

JOSHUA BARKER, Special Justice.

June 15th, 1808.—Four o'clock, P. M. parties meet, and Berthrong Anderson is examined as follows :

*City of New-York, ss.*—Berthrong Anderson being duly sworn, deposeth and saith the receipt is in the words and figures following, viz.

Received, New-York, March 20th, 1807, of Sarah Johnson, in behalf of Alexander Whistelo, nineteen dollars fifteen cents in full.

$19 15

his
PHILIP ⋈ SERING.
mark.

That the said receipt was written by him at the request of Philip Sering and his wife, and written according to their instructions—and cannot tell whether it was dated on the day it was written or not.—The deponent farther swears that he did not write any other receipt for the said parties about the business of Alexander Whistelo.

BERTHRONG ANDERSON.

Sworn before me this 15th day of June, 1808.

JOSHUA BARKER, Special Justice.

Adjourned until this day a week, at four o'clock, P. M.

*City of New-York, ss.*—Dr. Joshua Secor being sworn, deposeth and saith, that some time during the winter of the year, as he believes, 1807, he delivered the above named Lucy Williams, of, as he believes, a male child—That the said Lucy then was at the house of Philip Sering, at the corner of William and George-streets—

evidence of opinion that went to contradict a positive oath should be received with many grains of caution— the more so, as those opinions would probably be op-

That the said child was quite of a light color, but that children of black parents generally are whiter when first born than when they grow up. He believes that the father of the said child could not have been darker than the mother.—That children of black parents generally turn black within about nine months after the birth— That the shade or color of a dark man and a light man is generally between the two—That at the time the said child was born, he supposed that it had been begotten by a white man.

JOSHUA SECOR.

Sworn before me this 28th of June, 1808.

*City of New-York, ss.*—George Anthon of the city of New-York, physician, being duly sworn, deposeth and saith, that upon examination of the said child and its mother, he verily believes that the child could not be begotten by a black man, particularly judging from its hair which has every appearance of its being the offspring of a white person, and that is his opinion :—The hair of the mother being woolly, and that of the child not so, but having every appearance of the hair of a white person.

GEORGE ANTHON.

Sworn before me this 28th of June, 1808.

*City of New-York, ss.*—Philip Sering being duly sworn, deposeth and saith, that either a few days before Christmas, in the year 1806, or the first of January 1807, the said Lucy Williams came to board at his house, and was there three weeks and four days, and then was delivered of the child in question.

*City of New-York, ss.*—Phillis Morris being duly sworn, saith, that last summer a year ago, in water-melon time, the said Whistelo and Lucy both boarded at her house ; said Lucy was pregnant at that time, being advanced about three months.—That she heard the said Alexander say that the said Lucy was with child by him.— That the said Lucy and Alexander used to sleep together as man and wife.

*City of New-York, ss.*—David Hosack M. D. being sworn, saith that upon examination of the skin and hair of the said child and of its mother, he verily believes that the said child is not the offspring of a black man, but rather that it must have been begotten by a white man, or a light mulatto man.—That he has no doubt of it on his mind.

DAVID HOSACK.

Sworn before me this 29th of June, 1808.

*City of New-York, ss.*—Adam Ray being sworn, saith, that some time since he met the above named Lucy Williams in Chatham-street, and had some conversation with her on the subject of her said child ; in which witness asked her why she had taken the said child away from Mrs. Gaufs' ? to which she replied, that Whistelo would not own the child at first, and now he shall not have it, for the child is none of his, or words of that import.

ADAM RAY.

Sworn before us this 29th June, 1808.

NEW-YORK,    posed by others of very great authority. But he thought,
1808.      unless the woman could be otherwise discredited, such
           opinions, opposed to positive testimony, were of little
Commission-   weight, and ought to fall to the ground.
ers of the
Almshouse        Lucy Williams was then called and sworn;—the child
v.        and the reputed father, Whistelo, were also produced.
Whistelo.
                *Question, by. Vanhook.* Do you know Alexander Whis-
           telo ?

                *Answer.* Yes.

                *Q.* Tell the court whether he visited you; at what
           time; and what the result was ?

                *A.* It will be two years this August since the time I
           first saw him; he then told me he was a married man
           divorced from his wife, and never intended to live with
           her again.

                *Q.* Did he say he wished to marry you ?

                *A.* Yes; both before he went to sea and after he

---

July 20th, 1808.—Present.—J. BARKER and J. DE LA MONTAGNIE.

*City of New-York, ss.*—Wright Post, of the city of New-York,
physician and surgeon, being duly sworn, deposeth and saith, that
on examining the child above spoken of, and its mother, or Lucy
Williams, who is said to be the mother; he is of opinion that the
said child has not been begotten by the said Alexander Whistelo:
the reason why he believes so is, that when persons of different
colours have connexion together, their offspring is generally of a
colour approaching to a mixture of both the father and mother.

*City of New-York, ss.*—Samuel Borrowe says, he is of opinion
that Alexander Whistelo is not the father of the said child, and
that he supposes the father of the said child to be a white man.

*City of New-York, ss.*—Samuel L. Mitchill says, that he thinks
there is a possibility, nay- a probability, that the said child has been
begotten by the said Alexander Whistelo.

*City of New-York, ss.*—Edward Miller says, that it may or may
not be Whistelo's child, the hair and complexion are against it;
but the thick lips and flat nose are an indication of the father's be-
ing an African.

Seeing that the justices differed in opinion upon the evidence,
and considering that at all events their judgment was not final, it
was agreed between Mr. Vanhook, the attorney for the Commis-
sioners of the Alms-house, and Mr. Nitchie, attorney for the de-
fendant; that the case should be referred to the Mayor, Recorder,
and certain of the aldermen; and that it should stand upon the
same footing as if it had been originally brought before them: that
Whistelo should give security to abide their order in case the child
was adjudged to be his, if adjudged otherwise that he should be
discharged.

came back. He told others so also; he told Mrs. Hoff- <span>NEW-YORK,</span>
man, and——

*Q.* Did you consent to marry him, or did you refuse?
*A.* I refused; for I did not choose to have him—I did
not love him. He then carried me to a bad house, and
locked the door—I scuffled with him a long time, but at
last he worried me out. He went after that to sea, and
after he came back I told him I was with child.

*Q.* When was the child born?
*A.* The 23d of January, 1807.

*Q.* What was the day on which the affair you have re-
lated took place?
*A.* The 13th of April, 1806, on Sunday evening.
Whistelo first took the child to himself; but afterwards,
when they put it into his head that it was not his, he re-
fused to maintain it.

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

#### Cross-examined by Morton.

*Q.* Did he ever say it was his child?
*A.* No; but he took it at first.

*Q.* You say you became acquainted with him in Au-
gust, 1806, how do you know the child was got on the
13th of April—how long after that was it till Whistelo
went to sea?
*A.* On the 1st of May following.

*Q.* When did you next see him?
*A.* Not till the 4th of August following.

*Q.* When did you first perceive that you was preg-
nant?
*A.* Before his return.

*Q.* How did you know it?
*A.* By feeling life.

*Q.* When did you first feel that symptom?
*A.* Near two months before he returned.

*Q.* Then it was one month after he went away?
*A.* Yes.

*Q.* Did he not go a third time to sea?
*A.* Yes, in October: and he was gone for the fourth
time about eight days when the child was born.

*Q.* You went to a bad house—how do you know it was
a bad house where he took you?
*A.* Because no other would take in a man with a
strange woman in that manner.

NEW-YORK,
1808.

Commissioners of the
Almshouse
v.
Whistelo.

*Q.* Then you went to a bad house knowingly with him ?

*A.* I thought he was taking me to his cousin Mrs. Grough's.

*Q.* Were you always constant to him in his absence : were you never unfaithful to him when he was away ?

*A.* I never did when he was at sea.

*Q.* Had you not a white man in bed with you.

*A.* I had a scuffle with one once—I knocked off his hat.

The witness being pressed by the examination of Mr. Morton, at length confessed that such a person had been in bed with her : that he had turned the black man out with a pistol, and taken his place—that they had a connexion ; but she said she was sure they had made no young one, for they *fit* (fought) all the while. She said if the clerk had been at home he would not have used her so.

*Q.* Why, did you cry out ?

*A.* No, I did not hallo.

*Q.* Then what did you do to prevent him from executing his purpose ?

*A.* I bid him be quiet.

*Q.* Is the child a boy or a girl ?

*A.* A girl.

*Q.* Of what colour were your parents ?

*A.* My father was white ; he was a Scotchman, a servant ; and my mother was a dark sambo.

*Q.* How did the scuffling end—you understand me—did you part friends with the white man ?

*A.* He owes me four dollars which he would not pay.

*Q.* Was that *your charge* ?

*A.* He owes it to me for wages.

*Q.* But you took it out in scuffling ?

*Dr. Kissam sworn.*—After examining those parts of the child which particularly indicate the colour of the race, said, he should not suppose, judging from the general rules of experience, that it was the child of that black man ; but on the contrary of one of lighter complexion than the mother. Black persons are almost white at their birth, but change soon after.

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

*Question, by Sampson.*—How soon is the change generally complete, and their true colour decided ?

*A.* Generally about eight or nine months. Within the year it is complete.

*Dr. Hosack sworn.*—From the appearance of the father, the mother, and the child, and the laws of nature which he had uniformly observed in such cases, he certainly would not take it for the child of a black man. But would say it was that of a white one, or at most of a very fair mulatto.

### Cross-examined by Vanhook.

*Q.* Has it not some of the features of a negro ?

*A.* If its features, in my judgment, were those of a negro, I should not have given the opinion I did.

*Q.* Dr. Hosack, might it not be possible, judging after your reading or experience in such matters, that in the early stage of pregnancy the agitation of the mother's mind, irritation, terror, or surprise, might alter in some degree the nature and appearance of the child ?

*A.* I am not of that opinion.

*Question by Morton.*—What is the period at which a mother becomes sensible of her pregnancy, (as the witness calls it) by feeling life ?

*A.* From three to four months ; but four more commonly than three—at three it very rarely happens.

Several questions were put to this witness by Mr. Nitchie touching the albinos, their livid colour, and symptoms of disease and debility, with a view to obviate an attempt to account for the fairness of this child by such analogy. The witness answered that their entire appearance showed them to be exceptions to the ordinary laws of generation.

*Dr. Post sworn.*—From the appearance of the child, he would suppose it the offspring of a white man and a mulatto woman, or of two light-coloured persons. He could discern none of the features of a negro in it. There were instances of black men with black women producing children as fair as this ; but they were exceptions to the general laws of nature. His opinion was, that

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

this was not the child of Whistelo. What confirmed him most of all, was the colour and straightness of the hair. Being questioned as to the albinos, answered he never had seen any of them, but from what he has learned from books and conversation, is convinced that there is no analogy.

*Dr. Seaman* sworn.—I should not believe the negro to be the father of that child.

*Dr. Tillary* sworn.—Was fully of opinion with the other gentlemen—could not conceive this the child of a black man. He had no principles of physiology nor philosophical data to lay down touching *ticks* of that sort.

*Dr. Moore* and *Dr. Anthon* declared themselves of the same opinion.

*Dr. Secor* saw the child in question at its birth ; it was then quite white ; from its appearance at that time and now he is of opinion that it is the child of a white man.

*Dr. Williamson* said he had seen and observed both the man and the woman. If this was the child of that woman by that man, it is a prodigy ; and he did not believe that prodigies happened, though daily experience unfortunately proved that perjuries did.

*Dr. Osborne*, who from a long residence to the southward, had had the most ample means of observing all the varieties that these mixtures of race occasion ; but had never seen any fact that could warrant him to suppose this the child of a black man. He had seen albinos, but this child bore no resemblance to them. They were always distinguishable by the red.dotted iris, and the tremulous movement of the eyes. Never had seen the produce of African parents, with hair such as this. He had seen some with fair or yellowish hair, but that was peculiar.

*Mr. Furman, keeper of the Almshouse,* testified that he had received an order to take the child and place it on the books. The black man, Whistelo, took the child, but said at the same time that it was not his.

*Dr. De Witt* said he should have no doubt that it was the child of a white man.

*Adam Ray, a black,* knew of Whistelo having taken the child to board, and of the mother having it carried away. He asked her reasons for taking it back ; and her answer was, that since he would not own the child at first he should not have it now, for it was not his.

*Nancy Cooke* lived together with the witness six weeks —could not say as to her character, but saw a very *light* man in bed with her. There were two beds in the room; Lucy Williams had one, and witness the other. Witness fell asleep. Man lay with Lucy all night.

At the request of the counsel for the Commissioners of the Almshouse, the cause was adjourned till Saturday, as he professed the hope of procuring by that time other witnesses, whose testimony would tend to throw a different light upon the fact, and which he conceived altogether material and important to the ascertainment of the truth.

After some opposition on the part of Mr. Morton, who said he was under the necessity of going out of town, the cause was adjourned; and Mr. Sampson, who was present in court, was engaged to assist Mr. Nitchie in the farther investigation of evidence, and to sum up on behalf of the defendant.

### Saturday, August 20.

Present—The Mayor, Recorder, and Aldermen Mott, Bingham and Drake.

*Dr. Mitchill sworn.*—The woman, the child and the defendant produced. The witness was first examined in chief by Mr. Vanhook on the part of the Commissioners of the Almshouse.

*Counsel.* From your observations upon those persons, Dr. Mitchill, and from what you know of this case, be so good to state your belief, whether that child is or is not the child of that black man?

*Witness.* It is then expected that I should give an opinion touching the parentage of the child?

*Counsel.* Yes, sir; whether from all the circumstances you believe that black man to be its father.

*Witness.* It may be expected, perhaps, that I should give my reasons for my opinion, that it may be judged upon its own merits?

*Counsel.* If you please, doctor. The more so, as the counsel on the other side will probably inquire into them.

*Witness.* There are three general rules, as far as I understand, touching the propagation of men between the

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

white and black race.—First, when the connexion has been between white and black, the offspring is a mulatto—second, when the child is produced from an intercourse between a white man and a mulatto, it is then called a quadroon,—thirdly, when it is between a black and a mulatto, it is called a sambo.

In the French and Spanish islands there are more minute distinctions ; but for more certain information, witness referred the court to Bryan Edwards' History of the British Colonies in the West-Indies, by which any errors of his memory might be corrected.    The principle, however, is, that the shade is between the two in equal degree ; and it is told in a way that meets my assent, that when a rapid succession of intercourse has taken place between a woman and two men of different colours, twins have been produced of the opposite colours.

*Morton.*    What are we to understand, doctor, by rapid succession ?
*Answer.*    When a white man succeeds to a black, or a black to a white almost instantaneously.
*Question.*    Do not accidental causes sometimes operate a change on the fœtus at or after the time of conception ?
*Answer.*    Yes, sir.
*Question.*    Will you be good enough to describe them ?
*Answer.*    The changes which take place in the human form during the time of conception are reducible to three heads, according to the observations of D'Azara in his history of the quadrupedes of Paragua.—First, when there is an alteration of complexion so as to render the skin of a black, white, or other variety of colour.—Second, when the cause or agency manifests its power by frizzling or curling the hair or feathers, this is termed *crispation.*—Third, when the same constitutional change shows itself by a loss of hair or plumage so as to leave a naked skin, it is called *peeling.*    Of these three effects, the last occurs but seldom ; the second pretty often ; and the first is very frequent indeed, showing that it is a much more difficult process for nature to eradicate hair or feathers than to curl them, and more difficult to twist than to change their colour.    If it be of any importance to investigate minutely these points,

NEW-YORK.
1808.

Commis ion-
ers of the
Almshouse
v.
Whistelo.

they will be found at length in the work I have mentioned. These accidents, says that author, may befall every man, every quadrupede and every bird, to a greater degree in some than in others, and become permanent in the race by propagation from one generation to another without end.

With this view, it would appear, that with respect to the rule we first laid down touching the colour of men, there are a vast number of exceptions ; which exceptions I shall class under the three last mentioned heads. It is only by comparing those facts with the case before the court, and applying the observations which they furnish, that we can pronounce an opinion ; for as to reasoning *à priori* upon such a subject, neither the court nor I, nor any other witness that can be brought, can know any thing of the matter. The most that I can do is to state facts that I know, and from them give my opinion upon the probability of the case. The woman here swears the black man to be the father of the child——

*Morton.* Doctor, I am sorry to interrupt you ; but it is necessary I should remind you that the witnesses are only called to give testimony, not to observe upon it— that will be the duty of the counsel in summing up.

*Witness.* In estimating this case according to the exceptions laid down, and which I have observed are so frequent, and often so widely deviating from the general rule, I conceive that it violates no probability to suppose this child the offspring of the connexion between the woman and the black man. The mother, who knows most of the matter, has deposed to that fact, and it is not in itself incredible. I have, therefore, no hesitation to say, according to the best of my judgment, as the evidence of the woman is positive, and the fact she swears to violates no probability, I should, were I in the place of the court, confirm the rule.

*Morton.* Doctor, you must excuse me—before you seemed inclined to do the office of counsel, and now that of the judge.

### Cross-examination.

*Question by Morton.* This case you say, doctor, violates no probability. Are we to understand from that,

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

that it is a possible case or a probable one ?——or let me ask you, according to your own principles, which is most probable, leaving the woman's evidence out of the question, that this should be the child of a black or white man ?

*`Answer. Prima facie* I should say it was a case under the general rule. If I did not adhere to the rule, it would be on account of the circumstances attending the case, which I take to be an exception ; for if I have no knowledge of any matters which go positively to contradict the woman's testimony, I should naturally lean towards it.

*Question.* Do you consider this case as having any affinity with what is called albinage ?

*Answer.* I have not much experience on the subject of albinos, as my residence has been chiefly in New-York, where such accidents rarely occur. But I have known instances of negroes turning white where there was no symptom of disease or sickness.

*Morton.* Have the goodness, doctor, to relate them.

The witness then related the case of Henry Moss. The Reporter having since obtained the original note of that case in the witness's hand writing, for more certainty, thinks it proper to insert it literally.

#### MOSS'S CASE.

" Some time in the year 1792, Henry Moss, who was born of black parents, and as black himself as negroes generally are, began to grow white. The first whiteness began about the nails of the fingers ; but in the course of the change none of them have fallen off, except those of the little toes. There has been no scabbiness, ulceration or falling off of the cuticle—nor could this covering be removed by rubbing, washing or chafing. The whiteness has spread over the whole body, neck, shoulders and arms, and down the thighs and legs. Some brownness remains in his face, hands and feet. He thinks his sense of touch more acute than it used to be ; and his feelings so sharpened, that he is more readily affected by solar warmth than he formerly was, being able, while he was black, to support great degrees of sun-shining heat. A change has taken place in his sight. He has had no

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

sickness before or during this alteration of colour to account for it. The skin is of the white carnation hue, and the blue veins plainly visible through it. The *rete mucosum* seems to have undergone the principal change. His woolly hair is falling out, and straight hair coming in its place on his head; and the same thing has already happened on his legs. He observes his flesh is now less disposed to heal from wounds and cuts than it used to be.

*Q.* Are there no other facts which influence your opinion?

The witness here mentioned two other cases, which for the reason above given, the Reporter copies literally from the Medical Repository.

### MAURICE'S CASE.

" A young negro, named Maurice, aged twenty-five years, began about seven years ago to lose his native colour. A white spot appeared on the right side of his belly, which is now about as large as the palms of two hands. Another white spot has appeared on his breast, and several more on his arms and other parts; and the sable cloud is plainly disappearing on his shoulder. The skin of these fair spots is not surpassed by the European complexion. His general health is, and has been good; and he has suffered no scalding ulceration, scabbiness or other local disease. The change is not the dead white of the *albinos*, but is a good wholesome carnation hue. Such an alteration of colour as this militates powerfully against the opinion adopted by some modern philosophers, that the negroes are a different *species* of the human race from the whites, and tends strongly to corroborate the probability of the derivation of all the *varieties* of mankind from a single pair. Facts of this kind are of great value to the zoologist. How additionally singular would it be, if instances of the spontaneous disappearance of this sable mark of distinction between slaves and their masters were to become frequent! They would then be no less important to the moralist and political economist."

### POMPEY'S CASE.

" Pompey, a very healthy negro, of about twenty-six years of age, about two years since discovered on his

NEW-YORK,
1808

Commission-
ers of the
Almshouse
v
Whistelo.

right thigh a small white spot, which, from that to the present time, has been constantly increasing to the size of nearly a half-crown piece; while there have appeared, on other parts of his body, other spots, to the number of twelve, of different sizes, but all constantly and gradually enlarging. In several of the spots, the margin is perfectly defined, from a distinct line between the clear white and the natural colour. In others there are circumscribed rings of a dun appearance, the external margin of which is very regular. I have the fullest belief that a very few years will complete the total change."

*Q.* Was there not some other case which you mentioned before the police office ?

*A.* I mentioned somewhat jocularly the loves of Theagines and Chariclea. Chariclea was a beautiful and fair virgin, of Ethiopian parents. Her whiteness was occasioned by her looking on a statue of Venus.

*Question by the Mayor.* About what time, doctor, might that have happened ?

*A.* The work is written by a christian bishop, Heliodorus, who wrote about the fourth century. It was the first novel I ever read, and made a great impression on me.

*Q.* As to those cases in which the agency of some external objects upon the mother's imagination produces an entire change in the fœtus, have you any facts within your own knowledge ? .

*A.* There was a man in the city of New-York who kept a cow.

*Q.* Will you tell the court, doctor, the story of that cow ?

*A.* The cow was a favourite with the wife of the man, but he found it more convenient to kill her than to keep her.

*Q.* And how did the death of the cow influence the birth of the child ?

*A.* The cow, affording a larger supply of provisions than was required for family consumption, he sold part and reserved the rest.

*Counsel.* Very well, sir, be so good as to relate the rest.

*Witness.* Among the parts that were reserved, were the feet. The wife saw them hanging up in a mangled

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

state. It was the first news she had of the death of her favourite cow; and she was so vehemently moved and so shocked, as to affect the child of which she was then pregnant.

Q. And what was the result?

A. The child was born without any arms, and with distorted feet.

Q. Did you ever converse with the father or mother of the child?

A. I did not. But the child is still alive: and there is no doubt of the fact.

Q. Have you examined the child?

A. I saw it once as I passed, playing with a cooper's shaving knife between its toes. I stopped to inquire, and was told the story.

Q. Is there no other case, ancient or modern, to support this theory: is there nothing in verse or prose?

A. There is a case, called the Black Case, in Haddington's poems. He was a lord of sessions, or other considerable man in Scotland. The story runs thus:— There was a man who followed the profession of an attorney, or a scrivener, who had a very amorous wife. But he had not leisure to attend to all her gayeties. Once, that he was unable otherwise to free himself from her importunities, in toying with her he upset his inkbottle in her shoes. She brought him a black child in consequence. He reproached her, but she reminded him of the ink-bottle, and of his awkwardness.

There is also the story told by Malebranche, of the woman who saw a man broken on the wheel, and bore a mangled and disjointed child.

If such changes as the last are true (and there is strong authority for it,) then the mere change of colour or complexion is not difficult to believe.

The cross-examination of doctor Mitchill was continued by Mr. Sampson; and extending to a variety of topics, produced much anecdote and repartee.

The subject of the albinos was fully discussed. Their feeble structure—weak eyes—leprous appearance—their being found chiefly in low latitudes: and the Chacrelas of Java, the Bedas of Ceylon, and the white Indians of Darien, were instanced; who are all within the 18th degrees of north or south latitude. Mr. Buf-

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

fon's opinion was cited, that they were not a distinct race, but individuals degenerating from black to an adulterated white : supposing the blacks to have degenerated originally from the white to black.    But as it was admitted, that the whiteness of this child bears no resemblance to that of the albinos, and cannot be explained on the same principles, it is unnecessary to pursue all the details of the examination on that point.

The proximate cause of the fairness of the albinos was stated to be the absence of the *rete mucosum*, which gives colour to the black men : and the dots and redness of the eyes in albinos was supposed owing to organic debility, which admits of extravasation of the blood, and of its lodging in the globules in the iris.    The want of the *rete mucosum*, which fortifies the eye of the negro against the sun's glare, is the reason at once why the eyes of an albino are unable to bear the sun, and more fitted to see by night.

Mr. Sampson mentioned the two children of Chamouni, or albinos of the Alps, with whom he had frequently conversed.    He compared their eyes to those of owls and other animals, fitted for night or long twilight, which called forth an anecdote from the witness of a numerous flight of white arctic owls, which had some years ago visited this city, remained some time and then disappeared, having never been heard of before or since. The witness also mentioned the white sparrows of Sweden, the hares of Albany, and a white bird with which he had been regaled in Canada, whose flesh was very delicate. But to a question put by the counsel, he answered that he had never seen a race of white deaf dogs.

Mr. Sampson then apprized the witness that since his opinions were likely to be unfavourable to the side he was to advocate, he must avail himself of the privilege of cross-examination.    It would be necessary with so learned a witness to say, that the adverb *cross* was not to be taken in the vulgar acceptation.    *Cross* was in contradistinction to *direct ;* and cross-examination meant only an indirect examination.    The ignorant, who take things in the wrong sense, often show ill-humour, and put themselves in an attitude to be *cross*, because they are to be *cross*-examined.    With the candid and enlightened, it proves often an agreeable mode of discussion, and is par-

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

ticularly so to our profession, when it gives us occasion to extract from those of superior learning, knowledge, which we might not otherwise have the means of acquiring.

The witness expressed great readiness to answer any question for the satisfaction of the court or the counsel; and the examination proceeded as follows :

*Counsel.* What do you think, doctor, of the opinions of Plato, touching the principles of generation ?

*Witness.* Do you mean also to ask me Pythagoras's opinion on wild fowl ?

*Counsel.* Far be it from me, sir ; that question might serve to puzzle a man who was in the dark—mine are meant to elicit light from a source where it abounds.

*Witness (bowing.)* I do not know, sir, to what particular opinions you allude.

*Counsel.* To his triangle of generation, as well as to the harmonies and mysteries of the Number Three.

*Witness.* I have never devoted any attention to such mysteries. A triangle has three sides and three angles, if you can find out the mystery of that.

*Counsel.* Has not a prism three sides and three angles ?

*Witness.* It has.

*Counsel.* Could Plato have meant that any thing resembling a prism could have an influence in generation ?

*Witness.* You seem, sir, to have thought enough upon the subject to judge.

*Counsel.* Sometimes the more we look the less we see. Can you, upon any principles of plane or spheric trigonometry, produce a triangle which shall be flat on one side and round on the other ?

*Witness.* That, perhaps, is an Irish triangle ; if so, you can produce it yourself. Will you permit, me now, sir, to *examine* you a little ?

*Counsel.* Oh, doctor, you cannot be serious—not surely in the face of the court !

*The Mayor.* I think, Mr. Sampson, after the manner in which you have examined the witness, he is entitled to what he desires.

*Counsel.* Alas, sir, I am but a poor tradesman, labouring at my vocation :—if I let him wind that long chain of causes and effects round me, I shall be so entangled I shall never be myself again. It is play to him, but death

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

to me. I pray the court to let the shoemaker stick to his last.—Doctor, are you familiar with the opinions of Aristotle upon matter and motion ?

*Witness.* Your question, sir, is very general.

*Counsel.* I shall be more particular.—Do you believe that matter is the capacity of receiving form ?

*Witness.* I believe there is a first cause which is the law to which all matter is subject.

*Counsel.* That first cause is too far off for my span ; let us keep to one less remote. Is it not a corrollary from the opinion of Aristotle, that the son should resemble his father ?

*Witness.* 1 do not see that it is.

*Counsel.* I wish, doctor, I could establish some differ-ence between you and these great luminaries of ancient times. The authority of your opinion requires some such powerful counterpoise.

*Witness.* Well, sir, propose your questions.

*Counsel.* Since I cannot press these great men of an-tiquity into our service, I shall endeavour to find some-thing in doctor Mitchill, to set off against doctor Mit-chill. The counsel on the other side will not fail to avail himself of your opinions to the utmost extent, per-haps beyond your intention. I wish, therefore, by taking your opinion touching the probability of other facts, to find what degree of belief you attach to the present, and by establishing a standard of faith, fix a boundary line between us ; and also to discover, if possible, how much light learned opinions may throw upon this cause.

*Witness.* Some years ago there was a machine in-vented, called a light guage or photometer, which was to measure the degrees both of light and shade, but part of it always failed or broke ; or, for want of encourage-ment, it never was brought to perfection.

*Counsel.* Oh what a pity ! I once projected a machine to measure happiness, wisdom, love, and other moral qualities and affections ; but the ladies secretly discour-aged it, fearing to have it known how they loved the fel-lows. Since then that our machines are out of order, doctor, we must proceed by the imperfect modes of our fathers. Are you acquainted with a story related by Mr. Saussure, of a lady of quality of Milan who had seven sons?

NEW-YORK, 1808.

Commissioners of the Almshouse
v.
Whistelo.

*Witness.* I have no recollection of such a story.

*Counsel.* It was this: the two first of her sons, and also the two last had brown hair and black eyes; the three intervening had blue hair and red eyes.

*Witness.* Very possible.

*Counsel.* That is not all. The author accounts for it in this way: that while the mother was pregnant with three red-haired and blue-eyed children, she had also conceived a violent passion for milk, in which she indulged to excess. This might, when related by Mr. Saussure, have passed for a traveller's story. But it is adopted by an eminent physiologist, Mr. Buzzi, surgeon of the hospital of Milan. What would you infer in such a case ?*

*Witness.* I would infer that the milk must have been blue, such as they sometimes sell mixed with water; otherwise I cannot see how it could have made the children's eyes blue.

*Counsel.* I think not, doctor; they would have been rather of a cream colour. It must have been milk and water. or skimmed milk. It is a loss that the case does not mention which. Do you think it credible, sir, that Louis the II. king of Hungary and Bohemia, was born without his epidermus or scarf-skin ?

*Witness.* It is not impossible.

* *Remarkable effect of a pregnant mother's imagination.*

" A young married lady, pregnant with her second child, being with her parents at Brunswick, in New-Jersey, where it was fixed she should lie-in; when that time drew nigh, she sent to New-York for her nurse; and having made every necessary preparation for the interesting moment, waited with tranquillity for a few days before it arrived. Nurses generally employ this time in tale-telling, gossiping, &c. The nurse in this case told, one afternoon, to the pregnant lady and her mother, how she had once nursed in the family of a Jew, and how she saw the little infant circumcised; and dwelt upon the description of the operation with great minuteness. The young lady sat and listened, and being very susceptible of sympathy, first shed tears, then fainted. A day or two afterwards she was delivered, after a very short labour, of a boy. All went on very well till the next day, when the nurse discovered that the child's prepuce was diseased. Dr. Scott, of Brunswick, was immediately sent for. He came, and on examination, found *the whole of the foreskin destroyed by a sphacelus !*

" The above circumstance happened in the winter of 1798-9. The young lady. her husband and child, all died in the course of the year." *Vide* Med. Rep. vol. 3. page 82.

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

*Counsel.* Yet for a king to come without his skin, that was coming very naked into the world. What do you think of Zoroaster king of the Bactryans?

*Witness.* I have never thought about him.

*Counsel.* Pliny says he came laughing into the world —is that probable?

*Witness.* It would be an exception to the general rule, for we generally come into the world crying.

*Counsel.* And seldom go out of it laughing: so that as the only time we have to laugh is when we are in it, it is wise to profit by it. Do you recollect Pliny's remark upon this king; that he little knew what a world he was coming into, for if he had foreseen his destiny he would not have been so merry.

*Witness.* It was a witty remark of Pliny if it was his.

*Counsel.* Apropos. May I ask what you think of the opinion of the great Verulam, that when mothers eat quinces and coriander seed, the children will be witty?

*Witness.* Some persons have a great deal of wit, but I dont know how they came by it.

*Counsel.* Do you think, doctor, as the counsel on the other side does, that a pistol is an instrument of much efficacy in generation?

*Witness.* On the contrary, sir, a pistol is generally used to take away life. There is what is called the *canon de la vie.* Do you mean that?

*Counsel.* Of what colour may that be, doctor?

*Witness.* It may be black or white.

*Counsel.* Which of the two would be most influential on the birth of a white child?

*Witness.* Most probably the white.

*Counsel.* There it is! I will lay my life that is what the man had in his hand when the scuffle began, that so strongly affected the mother. Did you ever hear how the mistress of Pope Nicholas III. was brought to bed of a young bear?

*Witness.* No, sir; but many women have had bearish children.

*Counsel.* After that, I think they may bear any thing. Do you find a great affinity in what concerns generation between man and beast?

*Witness.* Undoubtedly.

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

*Counsel.* May not the principle of maternal affection influence in one as in the other ?

*Witness.* I am of that opinion.

*Counsel.* So that when the Dutch farmers on Long-Island plough a black mare with a bay horse, to have a bay colt, the idea is not unreasonable ?

*Witness.* There is nothing unreasonable in ploughing a black mare with a bay horse, nor in a black mare having a bay foal, more than a black hen having a white egg.

*Counsel.* Does not Mr. D'Azara lean to the notion of a primitive colour ?

*Witness.* He gives the philosophers their choice in supposing our first parents to have been either of white or black complexion.

*Counsel.* How do you account for the ring-streaking of Laban's lambs? The fact we cannot doubt; we have it on such high authority. Does it appear to you an extraordinary interference of Providence in favour of an individual, or can it be accounted for by the principle of maternal affection, and by the ordinary laws of nature ?

*Witness.* By the ordinary laws of nature.

*Counsel.* That being the case, doctor, there remains only to thank you for the information you have given us.

*August,* 1808.

*Dr. Pascalis, sworn and examined,* said that the child in question appeared to him to be three-fourths white and one-fourth black—that was his impression. But he pronounced with diffidence upon such subjects, as he knew how easy it was to err where there was a want of certain *data.*

Nature was uniform in her works and faithful to fixed rules ; and when facts are in dispute or doubt, there is no way of forming an opinion but by recurring to those rules which experience has established. Witness had lived long in the West-Indies, and had remarked three principal characteristics of the negro race, and all compounded of it.

First, the crispations of the hair.

Second, the *rete mucosum* which gives the black hue to the skin.

Third, the conformation of their legs and feet.

These characterizing marks are discernible in all the

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

mixtures between black and white ; but according as the mixture participates more of one than of the other, so naturally will the hair, the features, the complexion and the structure of the limbs.   He had observed, farther, that in general when there happened in any one or more of these distinguishing indications a deviation from the general rule ;   for instance, wherever the complexion partakes more of the white than from the known parentage, it should be expected then it would be found that in some other of those indications there will be preponderance the other way.

One example which he cited out of numbers which he had  noticed, was the  French general, Rigaud.   He was the son of a white man, a relation of the witness, by a black woman.   He was so dark as to differ little from the true African complexion ; but in return for that, he had the features and form of a white man—was very handsome and well made.   If this principle of nature is not universal, it is, as repeated observations had proved to him, very general.   The last symptom of the negro blood which disappears, is the crispation of the hair and the setting on of the ancle, which he described in technical language amounting to this, that the leg was inserted more  forward on the foot,  and consequently the heel longer.   He, therefore, when he was told that this child was of a black man, examined it to discover whether, seeing its complexion was so unusually fair, there were not some strong traces of the black race to counterbalance that deviation ;  and upon looking at the conformation of its feet and legs, and more particularly at the straitness and light colour of its hair, he was disappointed not to find his observation verified ; and he was now of opinion that it was not the offspring of a black man.

He conceived the woman to be a perfect mulatto. He had known one instance of a woman of mixed blood having a white skin with the features of a negro strongly pronounced.

### Cross-examined by Vanhook.

*Question.*  Might not some accident, happening at the moment of coition, produce by its effects upon the woman's imagination as great a deviation from the general rule as this?

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo..

*Witness.* Why make that particular conclusion? it would be much more apt if it produced any thing to pro-duce deformity or abortion: but it would be too far-fetched to suppose it would cloud or uncloud the skin. Upon the whole, as I am impressed, I must give my opi-nion that it is not the black man's child.

*Alderman Barker sworn.* Stated that the woman when examined before him, said she had no intercourse with any white man. Afterwards she acknowledged she had had a struggle with one.

*Mr. O'Blenis, clerk of the police,* stated, that after her examination on oath was closed, she was questioned as to that fact, and answered laughing that the white man had torn her petticoat.

*Sir James Jay, M. D. examined by Vanhook,* gave a de-cided opinion that it was not a black man's child, asked whether he lay much stress upon the colour and straight-ness of the hair of the head, and whether it might not yet become like that of the mother. He said it was not necessary to wait so many years as to see what confor-mity there might be in the hair with the mother. It was enough if the counsel chose to examine the mother at present.

*Question by Sampson.* Doctor, we have been deep in the mysteries of Lucina.

*Witness.* Very good, sir ; I hope you have profited.

*Counsel.* No, sir James ; it is a cross birth—we are not yet delivered of our doubts. We want to know whether the Abbe Spallenzani's method of propagation is a safe and good one—whether there is not such a thing as *Lucina sine concubitu;* for, as it appears, the black man could not have got the child because it is white, nor the white man because of the fighting, it would be good to see whether the pistol-barrel could have got it?

*Witness.* Then, sir, you must inquire elsewhere touch-ing that matter. I have found the old practice good enough for me, and have made no experiments in the way you allude to.

The evidence closed here, and Mr. Morton addressed the court, premising that it was his intention to be very brief, and to confine himself entirely to the positive tes-

NEW-YORK,
1808

Commission-
ers of the
Almshouse
v.
Whistelo.

timony and the inferences of law which it furnished, and leave to the counsel associated with him the various topics of curiosity which had been introduced.

Although this case was not of so grave an import, nor so serious in its consequences as a trial for a rape, yet still it was one in which the nature of the proof should be equally certain, as it went to inflict what, to a poor man, was a very heavy penalty, and which, if he was innocent of the charge, would be an insupportable oppression. The conviction here, as in a case of rape, would be founded upon the evidence of a woman, who, by the fact itself might become mother to a bastard child, whose character for virtue and good morals makes a principal part of the consideration. Necessity made this woman a witness, for it is her own cause in which she is swearing: but wherever from policy such testimony is admitted against the great ruling principle of law, that "none shall be witness in their own cause, nor to swear to their own criminality," it is always admitted with extreme caution, and qualified with well-placed jealousy. For it is better even that the community should suffer an inconvenience than an example of injustice be set, and a door opened to oppression.

This woman's evidence, without the irresistible proof which the child's appearance furnishes, and which the opinion of so many skillful men of profession confirms, carries with it its own refutation. The counsel here recapitulated the dates and epoch fixed by the woman from the time she first became acquainted with Whistelo in August, 1806—his going to sea on the first of May, and returning on the first of August—that she *felt life* two months before his return, which was only one month from the time she swears to his having got her with child. All the physicians agree that that symptom of pregnancy does not take place in less than three months, and that it is more commonly four. She has also positively contradicted upon one examination upon oath, what she positively swore upon another. At the police-office she said she had no connexion with the white man—before this court she has acknowledged that she had.

There is at least as much reason to charge the white man to be the father, with whom she states on her oath that she had a connexion within a few days after the *first*

connexion with the black. So short an interval must leave it impossible to determine, from the reckoning of time merely, which was the father. If so, and the matter was otherwise in balance, surely the child being white, is a circumstance strong enough to put it past all doubt. Another fact equally conclusive is what the mother told the witness, Ray, when she took back the child, "That the defendant at first would not own it, that it was not his, and that now he should not have it." Now, if this was a serious crime and a criminal prosecution, such evidence would not weigh a feather. I cannot see why there should be any more hesitation in the present case.

After Mr. Morton had finished, another woman was produced with her child. The woman was a light mulatto, and the father said to be a black man.

*Sampson.* If this be to prove any thing by comparison it is good, provided the object of comparison be certain. We must have proof of the parentage of this child, otherwise it is *ignotum per ignotius*.

Mr. Vanhook next, according to arrangement, summed up, and answered the observations of Mr. Morton, leaving to Mr. Sampson the reply.

He said, the arguments did not convince him in any degree that the black man was not the father of the child.

And if by fair reasoning, the party who sued was entitled to an order, the court would, in spite of subtle objections and raillery, grant it in furtherance of the statute. The commissioners of the Almshouse had instituted this suit as their duty obliged them, and the law directed. The woman's testimony in one view was meritorious—it went to discharge the community from the burthen of supporting a bastard child, and to oblige the true father to maintain it, and therefore should not be disfavoured.

Much stress was laid upon the time of her feeling her pregnancy, but that was not sufficient to destroy the force of her positive testimony on oath; a difference or mistake of a month or two, which may be the fault of her memory, is not enough to discredit her. What she said at the police is of as little importance, being easily reconcilable with what she has sworn here. She said she had no connexion with a white man, meaning no such connexion as could produce a child; and she admitted before the same magistrates, on the same occasion, that

NEW-YORK,
1808.

Commissioners of the Almshouse
v.
Whistelo.

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

she had a struggle with one, and that he tore her petti-
coat. If she did not say the whole of this when upon
oath, at the time her depositions were written down, it is
not material; she might not have been so particularly ques-
tioned till afterwards ; but viewed with common candor,
there is no contradiction to discredit her. On the one
occasion and on the other her evidence was this, that
she had a struggle with a white man, but that she pre-
vented him by resistance from accomplishing his pur-
pose, and was sure there could be no child born in con-
sequence of that encounter.

Why did not the gentleman on the other side call this
white man ? He could have contradicted her if her testi-
mony was false.

With respect to the alarm with the pistol and its pos-
sible effect upon the mother's imagination—that changes
in the fœtus do happen from such accidents, stands upon
the highest authority ; and has been supported in a way
not to be shaken, by Doctor Mitchill, who has related
facts proved past contradiction. Doctor Pascalis thinks
it far-fetched to suppose it would change the complexion,
but seems to admit that it might produce abortion or de-
formity ; yet the change the most easy of operation has
been stated to be that in the colour of the skin. Doc-
tor Mitchill has stated that reasoning à priori upon such
subjects is only presumption ; but that where facts of a
certain nature have arisen, it is possible that similar facts
may arise from similar causes, and he has given instances
of infinitely greater changes than this by the power of
maternal affection. Certainly, to oppose arbitrary rea-
soning to the authority of facts, is the height of presump-
tion ; and no man is better qualified from his extensive
reading and continued investigation, to collate a number
of facts, and draw certain conclusions from them.

Lastly, the woman's testimony goes to accredit the
supposition that the influence of fear or suprise, and the
sudden appearance of the white man armed with a pistol
—the struggle that ensued—the irritation it produced—
all combined to operate such change.

And although she be an unfortunate woman, and mo-
ther of an illegitimate child, yet let me repeat it, that her
evidence is here meritorious, as it goes to deliver the
community from the support of a bastard, and justly to

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

fix the man who begot it with the maintenance of it. And above all, that she is swearing not corruptly for her own interest; but against it, for if money was her object the white man was her mark.

*Sampson.* May it please the court. If ever the situation of man was full of peril and difficulty, so is mine. My learned colleague has taken to himself all that was *terra firma* in our cause, and when he had brought me to the world's end, plunged me headlong into that ocean of wonders and adventures where I am now adrift. He has, moreover, taken away his notes on which I relied, and left me no other chart than this stenographic scrawl wherein my eyes can discern nothing but objects of evil omen.* Arctic owls, mishapen monsters, and prodigious births. Well might I barter one hundred leagues of such sea for half an acre of brown furze. If I escape this time, I will hang up my drooping garments as an offering to Neptune, and never tempt my wayward fortune more.——I will now borrow courage from despair, and to the matter.

Soon after the vernal equinox, in the year of the vulgar era one thousand eight hundred and six, an Adam-coloured damsel submitted to the lewd embraces of a lacivious Moor, and from that mixture sprang three miracles.

1st. In the course of one month's time she quickened and conceived.

2d. She bare a child, not of her *primitive* and *proper* colour, nor yet of the African—but strange to tell, of most degenerate white.

3d. And the greatest of these wonders, she remained, as the counsel for the Almshouse charitably testifies, a lady of virtue and unblemished credit!

I had heard of a sect that trusted more to faith than to good works. The counsel it appears is of that sect, when he asks this honourable court to put its hand and seal to three such miracles. I would rather be called ignorant and simple than too learned and perverse. But

---

* Mr. Sampson had taken his notes in short-hand, and the allusion here is to certain emphatical words written in the common character, and of course more obvious to the eye.

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

since I cannot believe in the metamorphoses of old, nor in the procreations of Jupiter Ammon, I am sour upon the belief of all other such heathenish stories.

Before I lose myself in the labyrinth through which I am to tread, that I may not die in the learned counsel's debt, I shall first answer all his observations. If I should miss my way, and never return to where I set out, my will is that all concerned shall mourn for me—the whites putting on black, and the blacks white, in token of *affection*. *Item* : the manuscript I hold in my hand to be deposited in the city library. *Item* : the fee which I receive in this cause, to enure to the benefit of the Almshouse.

The counsel says that the reasoning of my colleague. has not convinced him. If it had, it would have been a fourth miracle ; for certainly the counsel's business here was not to be convinced.

He triumphantly asks why we did not call the white man ? and I answer, in all simplicity, because we had no need of him : besides, he is our rival, and carries pistols ; and we disclaim all prying into what does not concern us, and all indiscreet meddling with family affairs.

All the justice we ask for our poor black swain, is not to pay for a child he never got, nor be made a worker of miracles against his will : the thing of all things of which he thought the least, and of which he is the least ambitious.

Again, the counsel asks what motive could the woman have to charge the child to a black father, when she could have had a white one ? We do not know why—some love the darkness rather than the light.

But it is said evidence was meritorious, and for the good of the community, charitable, and for the good of the Almshouse. I never before heard of such pious and patriotic fornication.

But if she was disposed to perjure herself, would she not have laid the child to the richest-father as well as to the fairest ?

Perhaps not. Perhaps she wished to establish a partnership according to the custom of merchants, long used and approved within this city, to make one a *sleeping partner*, to contribute by his friends ; the other the active partner, taking the trouble and responsibility, and

giving his name to the firm. She has herself averred and proved this partnership, stated the *locus in quo*, and laid the *venue* in her bed, and it is too late now for the counsel to say it was a transitory action after *issue found*.

There is another legal view of this matter. The child may be a negotiable instrument under the statute of Anne, and one party liable as maker, the other as endorser. It is thus that commerce is every day encroaching on the common law. Formerly a bastard was *nullius filius*, and could have no father: now it seems he may have two, unless the court will think that it is carrying the commercial principle too far. Then if the court will allow only one father to one child, it is to be seen whether it will permit another innovation not less violent, viz: that black men shall be the fathers of white children by intendment of law. If a white man can say to a black one, get out of that bed, you black devil, till I do this thing—by division of labour trade will be advanced—you must do your part of the duty and I mine—I will get the child and you shall father it—there will be in this manner employment for us both—Can that, may it please your honours, be the law?

As to a complaint made by the gentlemen that we insinuated the evidence on his side to be altogether base, if it be any satisfaction to him we will retract that saying. We will admit that there was first and second fiddle and base accompaniment. But as he is himself the leader of the band, he ought not to complain of the effect.

After breaking a lance upon my colleague in the honour of this daughter of Eve, he attacks the doctors *en masse*. What do they know, he says, more than other men? But that is not all, he goes farther and levels a shaft at your honours on the bench, and says you have as much experience in such matters as any doctors or any persons whatsoever. Some gentlemen have a happy knack at saying any thing. If I had even suspected any of your honours of any such experience, or at all to have dipped into such matters, even from curiosity, I never should have ventured to hint at it.

After disposing of the faculty in a summary way, and representing all the doctors who dont believe that black men's children may be white, as a set of coasting doc-

NEW-YORK,
1808.

Commissioners of the Almshouse
*v.*
Whistelo.

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v
Whistelo.

tors, who dont go out of sight of land, who run by the
line and the dipsey lead, he then introduces a doctor as,
a god upon the scene.   Never was a god introduced
more apropos.   It was truly *dignus vindice nodus.*   It
was no longer your men of experience who believe no-
thing but what they see, and tell nothing but what they
know, who never go on voyages of discoveries or ex-
plore the unknown regions of hidden wonders.   Not so
doctor Mitchill.   At his name all ears stand erect ; might
and power are his attributes.   Be it so.   I rejoice in
his strength, I glory to magnify him, for if he be that
great Ajax Telemonius, who then am I, who have *seuf-
fled* with him for one hour in the heat of a burning day,
and come off, if not with victory, with life, which is great
honour ?   And now having returned by the same sally-
port through which I ventured out to skirmish with him,
once more I plant my standard on the ramparts of the
law, and display to the whole camp the trophies I have
borne off the field.

It is grievous to see the disposition that pervades man-
kind to laugh at serious things.   But ever, by the side of
eminent learning, there is a nitch where malice loves to
sport.   It is a quit rent which the learned owe to us
small wits ; it is an indemnity for the shade they cast
upon us, and we seize upon it by the title of amends.
I do very much respect the witness and admire his learn-
ing and his candour; but when I think of the odd ex-
cursion we have made to discover the parentage of this
child of nature, I must either laugh or die of it.

If a witness was wanted with a mind well-stored with
facts, he stands unequalled.   His is like the magazine of
some great commission-merchant, whose high credit and
extensive correspondence brings him consignments from
the four corners of the earth——with room for all, and
no particular reason for rejecting any, whoever would
make up an assortment to answer any demand, may call
upon him.   If the wares be not all his own, he has a
factor's lien on them, and a vested interest, and may dis-
pose of them for the benefit of the concerned.   If he
parts with them without *warranty*, and there is no *scienter*,
then they are at the risk of the party who receives them,
and the maxim is *caveat emptor.*

It was with this view of ascertaining how far these

facts were warranted genuine, or in other words, how many ounces of such testimony went to the pound, that I put so many questions to doctor Mitchill. I wanted to know whether we were to take by the Winchester or the standard bushel—whether our long measure was the ell Flemish or the common yard ; and the court will very clearly comprehend, or else will not comprehend how we came to treat of Plato's triangle, of the virtues of the number Three, and of the probability of the opinions of that great philosopher—viz. that when men and wo= men hold this sort of *tête-a-tête*, it is only for the sake of completing a triangle. If I did not pursue that curious subject farther, it was for this reason : from the moment I found out that a triangle had but three sides, I saw that the doctrine would not apply ; for make what angle you will of a man and woman, still as each has two sides *at the least,* a right and a left, the diagram which they describe must have four, not to speak of others that I am ashamed to mention.

We passed on to Aristotle ; but with all his form and his substance, his matter and his motion, his cause and his effect, he could not inform us how, without violating probability, the black man could get the white child ; and therefore, as we gained no light, we had no need of any photometer to measure how much. Fearing to trust myself longer in the dark, I passed on to the next topic, recollecting an old maxim :

*Desperes tractata niitescere posse relinquas.*

But I had the consolation to think, that for all that had yet passed between us, nobody was a bit the wiser.

The albinos, with their blood-shot eyes and white hair, with the arctic owls, Swedish sparrows, and white birds of Canada, I leave to the curious in wild fowl.

The strength of the adversary's case I take to be this : that at a critical moment, after Mr. Whistelo and Miss Williams had been just long enough in bed together to be drawing towards a perfect understanding of the business which brought them there, the lady saw, or thought she saw, an apparition of a white man making towards her with his cocked pistol in his hand ; and the true point now is whether that apparition did of itself beget the child, or only change it from black to white after it was

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

begotten, by acting upon the nervous system of the mother? The counsel showed a skill more than professional, which convinced me that he had gone deep into this subject, and probed it successfully. He understands the doctrine of animal appetencies, if not of chemical affinities.

It is curious to see how the learned will differ: Professor Röderer denies the effect of maternal imagination in changing the form or colour of the fœtus; and for so doing he gains the prize medal of the University of Göttingen. Doctor Mitchill maintains the effect of maternal imagination with all his might. And another profound and ingenious philosopher, doctor Erasmus Darwin, denies this power in the female imagination; but demonstrates its existence in the male, and says that the Calipœdia,* or art of getting beautiful children, as also of procreating males or females, *may be taught* by affecting the imagination of the male parent; for he says that the delicate extremities of the seminal glands irritate the organs of sense, either of sight or of touch. He recommends the art very seriously to those who are interested in the procreation of male or female children; and observes that the *phalii* which were hung round the necks of the Roman ladies, or worn in their hair, might have caused the great proportion of male children. He laments, finally, that the manner of accomplishing this cannot be unfolded with sufficient delicacy to meet the public eye. And I fear myself the squeamishness of the age to be such, that if any professor should propose a course of lectures, or any artist advertise to give lessons in this art, he would find very great difficulty and discouragement. A reflection, by-the-by, involving a satire upon mankind, since it is notorious that the most delicate of both sexes practise, with shameless hypocrisy, what is too bad, it would seem, to be spoken of without offending decency. I greatly wish, therefore, that the Abbé Spallenzani had brought his methods into general use, notwithstanding the slighting manner in which sir James Jay has treated them, because it would

* Doctor Darwin, and other learned zoologists, seem to have mistaken this term. It should be written *Callipœdopœia.*

*The Reporter.*

NEW-YORK, 1808.

Commission- ers of the Almshouse.

v.

Whistelo.

be a means of quietting the most scrupulous delicacy, and relieving persons of elevated sentiment from the neces- sity of course familiarities ; and be more suitable every way to the delicacy of the age. But as far as concerns the present point, whether Röderer, Mitchill or Darwin prevail, the cause is not a whit advanced ; for allowing that this white man operated upon the organs of sight or touch, whether of father or mother, so as to whiten the child, such a position would give birth to two doubts, more perplexing than any yet appearing. First, touch- ing the identity and individuality of the infant, of which individuality colour is a part. For if one makes a child black and another makes it white, shall it, while it con- tinues white, be said to be the child of the father who made it black, and not rather be taken to be his who made it white ? Even upon legal principles, such an act of ownership exercised by a man over the child of ano- ther, as bleaching him without authority, entitles him, whose child was so bleached against his consent, to aban- don altogether to the wrong doer, and to throw the child upon his hands. Certainly, if such a principle be estab- lished, as that white men can father their children upon negro fathers, it will very much advance industry, and encourage many to go abroad for employment who now stay at home.

But to return to maternal affection. A fair lady, to whom his holiness Pope Nicholas the Third, had com- mitted the sacred charge of bearing him *nephews* and *nieces,* brought him, to his utter discomfiture one day, a little *bear*—and why ? why, because he was of the Ur- sini family, and had every where throughout his palace carved and painted emblems of the name and honours of his house. Pope Martin the Fourth, who succeeded to the chair, the palace, and the mistress, fearful of like mischief, had them all effaced ; and accordingly his ne- phews and nieces were nice little *popines,* no more like bears than Miss Williams' child is like a negro.

At Tzertsogonbosh, in Germany, there was a religious procession. Some of the inhabitants personated angels, and some devils. One of the devils, more merry than wise, took it in his head, as soon as the pageant was over, to run home to his wife, and accosted her, if not in these words, in words to this effect: " You dear plague of my

NEW-YORK, 1808.

Commissioners of the Almshouse
v.
Whistelo.

life, for all the vexation you have caused me from the beginning of the world till the date of these presents, I am determined forthwith to do in sort that you shall hereafter be the mother of a young devil."—She scuffled, he " worried her out, and had a connexion with her ;" and whether she *felt life* in *one* month or four, she finally bore him a young devil. Doctor Mitchill saw nothing improbable in a fellow playing the devil with his wife, or begetting a little devil. He thought it prudent, however, to inform himself whether it was a dancing devil. I am cautious in what I relate ; and as I did not know what dancing-master it had, I would not undertake to say : it was, however, a merry-begotten devil, and probably a dancing one ; and it is not impossible that it might have been one of those that tempted Saint Anthony, twenty thousand of whom it is said could dance a saraband upon the point of a cambric needle without incommoding each other.

That the learned sometimes account for things quite differently from the rest of mankind, will appear from the sequel of the story of the lady of Milan and her seven sons. There was a tattle when I was at Milan, but as those who believe it had not read *Simon Pontius, de Coloribus oculorum*, it may be entitled to small credit. There was, they said, in those days a young Scotch laird, blue-eyed, and red-haired, who made the tour of Italy to see pictures and statues, and kiss the Pope's toe ; but that his devotion was pricipally warmed by the image of this cis-alpine saint; that he came at different times to worship at her shrine, and finally, that it was he who recommended the milk that turned the children's hair red.

So much for maternal affection with human kind. But as there is a comparative anatomy, why not comparative zoology ? and, unfortunately for the pride of man, in the act on which our philosophers and doctors have delivered their opinion, the similarity is entire. Poets have viewed it in the same light; and the prince of poets defines it to be making the beast with two backs. He too, by the bye, was for the *maternal* affection, for he makes Iago alarm Brabantio, lest Desdemona should " be got with child of a Barbary horse," and he should have " coursers for cousins and gennets for german." It was

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

conformable to that idea that I asked doctor Mitchill whether the farmers on Long-Island could reasonably expect to have a bay foal when they ploughed the black mare with the bay horse. He saw no more wonder than that a black hen should have a white egg: and then would have been the time, but for the fear of lengthening out the trial too far, to have discussed the great problem of the eternity of the world, which many venerable philosophers, according to Censorinus, supported by the single argument of an egg.*—For they said no egg was produced without a bird, and no bird without an egg; and as it never could be shown which was first formed, it followed that the world had no beginning. We might have shown upon the authority of Aristophanes, how the world was produced by divine love, and divine love from the egg of night, hatched by chaos. If we had been prepared to go into eternity, *there* would have been a range! *There* was a subject fit for philosophy—one *never to be determined.*

Touching the old cow that was killed, I can only say that whatever doctor Mitchill says he saw, I believe as if I had seen it ; I therefore believe he saw a cripple playing with a cooper's knife, and playing with it between his toes. I believe, also, that the neighbouring gossips told him the story of the dead cow ; but I am not bound to believe all they said. When such facts occur, it is so natural to run the back scent, and if memory does not furnish something, invention will. I once, however, saw a man who was born without arms, but his father had killed no cow.

It is a good rule, that golden rule of king Charles, to believe the half of what we hear. It is a good rule of jurisprudence to reject all hearsay evidence ; and it is a good rule to reject a great deal more. A man made a fortune by wagering to the contrary of what every body said. If his maxim was true in common life, how much more so in philosophy ?

The attorney's case in Haddington's poems, with the difference only between black and white, is a case in point. He was an awkward fellow to upset his ink in

---

* *Negant omnino posse reperiri ævesne ante an ova generata sint. Cum et ovum sine ave et avis sine ovo gigni non possit.*

NEW-YORK, 1808.

Commissioners of the Almshouse
v.
Whistelo.

his wife's lap. It was such an ill-natured return for her caresses, ingratitude of so black a dye, that he deserved his fate.

The world has been in ignorance on another subject, which this trial has promulged.—First, all negroes were supposed to be black. In process of time it was discovered that some were white ;—and now it appears that others are pye-balled. He that doctor Mitchill saw, in the very act of metamorphose, was a full grown man, and could not be influenced, one would think, at that time, by any affection of his mamma to change his colour. That fact then remains to be accounted for on some newer principle. I once knew a Mr. Percy, a composer in music and a singing master. He taught in my family, and he confessed one day in the fulness of his heart, that he had been credulous enough to throw away a guinea a visit for several months, to a quack, calling himself an ancient magnetist, who undertook by gestures and wry faces to take a purple stain from the cheek of a favourite pupil. In the beginning of the *course of magnetism*, all parents, kindred and neighbours, glorified this quack, for they thought they saw the mark disappearing from the edge of the lower eye-lash. But finally they were convinced that they were imposed upon.

There was a horse shown some time ago in New-York as a wonder, and he passed well enough because his tail was shaved and his buttocks painted dapple green. It is the easiest thing in life to work a wonder.

The last question I took the liberty of asking doctor Mitchill, in order to come to a just estimate of what he conceives the line of probability, was, whether the fact which we have on Scripture authority of the changes worked upon Laban's sheep by the contrivance of Jacob, was to be considered as a miracle, or, on the principles of maternal affection, a thing within the ordinary laws of nature ? And the learned witness answered, without hesitation, that it was to be accounted for by the ordinary laws of nature. Seeing that this is so, and that in matters of generation the resemblance is so perfect between man and beast, I wonder it has not ' ago turned to the embellishment of the human, Ladies might then go to the ball, and Indians t without paint ; and it would be an innocent p

variegate boys and girls, by means of coloured sticks, feathers and ribbands ; and the Dutchmen might display their taste upon their children as they now do upon their tulips.   How pretty and pleasant to see little natural Harlequins playing about !  But for the ignorance of our fathers we might have been burnished like game cocks, and had wives like birds of paradise, and daughters like cockatoos: now and then those that love curiosities might have a little monster, and for those who think two heads better than one, it would be quite easy to frighten the mother out of a child with two heads.

Let not the learned witness complain that! we treat his opinions lightly ; the greatest philosophers in the universe have been thought, upon some particular subjects, too easy of belief.

Hippocrates relates that his mother used frequently to tell him that for two years before his birth she had no carnal intercourse with his father.   But that she had been strangely influenced one evening as she was walking in the garden.

Galen, in his treatise on the measles, says the disease was brought by a woman who had no father.

Doctor Harvey, who discovered the circulation of the blood, is said to have believed and written of a race of men with tails.

Diodorus Siculus mentions a sorceress of Egypt who had passed for the celebrated Isis, upon the strength of bearing children without the help of men, but that a priest of Mercury was detected in her bed.

Livy speaks of a woman brought to bed in a desolate island, where she had not seen a human face for nine years.   She was brought, he says, to Rome, and examined by the senate.   What a pity that we had no report taken in short hand of the arguments of the jurisconsults, and the opinions of the conscript fathers!

Lord Bacon, in treating of the period of gestation of various animals, says gravely, that an ox goes twelve months with young ; and doctor Mitchill, of North America, was so impressed in early life by reading the novel of the christian bishop Heliodorus, entitled the loves of Theagines and Chariclea, that he could not see any improbability in black men getting white children!

A Prussian soldier was detected taking certain jewels

NEW-YORK, 1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

and corporal ornaments from the image of the Virgin Mary, and boldly asserted that she gave them to him. The case was novel, and a counsel of prelates and other learned men was convened, who, not averse to miracles, adjudged the thing possible. Frederick the great, understood trap, and suffered the soldier to be discharged; but next day it was proclaimed that on pain of death, none should thereafter take advantage of the generosity of the Virgin Mary. Now let it be proclaimed by authority of the mayor and corporation, that no black man shall hereafter presume to get a white child; but let the fellow be, in the mean time, discharged.

And now that we have returned from our voyage round the world, let us look how the thing stands on a nearer view. Ten or twelve of the most experienced physicians declare this thing next to impossible. One gentleman says, emphatically, that if it is true, it is a prodigy, and prodigies, he believes, do not happen, though perjuries do. Some of the professional witnesses have resided long in those countries where, if such facts were natural, they must have fallen within their notice; but they never saw one such as would warrant their belief in this case—others have practised in that particular and useful branch which enables them to judge with certainty in matters of this nature; and envy cannot deny of them that they have brought more into the world than they have sent out of it. The very gentleman who ushered into life the babe, whose name will be bright in the annals of zoology, physiology, pathology, and all the *ologies*, (doctor Secor,) agrees that it is the child of a white man. Doctor Mitchill denies it, partly on the authority of the quadrupeds of Paraguay, and partly because Miss Williams has deposed otherwise. Allowing the analogy in such transactions beween men and four-footed animals, yet I am not so easy in allowing weight to the testimony of a woman, who swears to her own shame; and if I did give weight to her testimony, I should not admit any conclusion to be drawn from it in this case; for it is as strong one way as the other. She scuffled with a black man in a bad house, and he worried her out and had a connexion with her. Very good. Shortly afterwards she scuffled, or fit, as she termed it, with a white man, and knocked off his hat, but

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
*s*.
Whistelo.

he afterwards came to bed with his hat, and had a con-
nexion with her. Did you cry out? No, sir. What
then did you do? I bid him be quiet! Well! where is the
difference, except in this, that the white man had no hat
upon his head? Will it be contended, now, on the au-
thority of any treatise upon generation, that a man can-
not get a child without a hat upon his head? Here I
might say, without indiscretion, your honours have ex-
perience to the contrary. No well bred man would
think of going to bed to a lady with a hat on ; if he did,
she would do well to knock it off. If he was so much
afraid of catching cold, he might have put on his night
cap. To be sure, if he be of the society of friends, it
alters the case, because then it might be an inconve-
nience ; but could not be considered an incivility—but
there is no evidence of that.

Besides this, the evidence of alderman Barker and
Mr. O'Blenis, shows that she has contradicted herself
upon oath, for, before them she swore she had no con-
nexion with a white man. Here before this court she
admits, when upon oath, that she had. She admitted,
it is true, before those magistrates, after her deposi-
tions were given in, that she had a scuffle with the white
man, and that he tore her petticoat ; but that does not
reconcile the contradiction upon oath Tearing a pet-
ticoat is not having a connexion ; nor is it to be sup-
posed that all the passions with which that white man
was influenced, were to be allayed by the small satisfac-
tion of tearing her petticoat. Where there are Helens
there will be wars; but the most quarrelsome will not
fly to arms for the sake of tearing petticoats. I defy all
the annals of pathology to show a case of a man affected
with such an antipathy to petticoats. But it may be
said one of those scuffles was more platonic than the
other. I do not believe that. The one worried, and
the other *fit*. Platonic love does not carry pistols, nor
jump into bed with its hat on. Such scuffles may differ
in etiquette—but not in reality. "Montague's men are
always thrust from the wall, and their women to the
wall." Can we believe that the white watch made the
black watch turn out, merely for the sake of a warm
hammock? If that be so, I can only say, "delicate plea-
sures to susceptible minds!" But that is not the argu-

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v.
Whistelo.

ment; the woman herself says, that there were no young ones that time, because they *fit* all the time. If they fit, what more is wanted? One of the counsel asked whether many races of animals were not propagated in strife, and he instanced cats: but he might have taken a still nobler instance, that of the Sabine women, who scuffled with the Roman men, yet bore them children. All history, sacred and profane, is full of children begotten in violence. There are countries where a scratched nose is a sign of victory rather than defeat; and where a woman who surrenders her favours without resistance, is like a general who surrenders a strong place without a shot. Say then that one scuffled like Boreas, the other like Zephyr—still it comes to the same thing; for Zephyr, mild as he was, got Flora with child, and Boreas with his Orythia could no more, except that he got twins with wings on them. The terms in which Ovid makes Flora give her evidence, are so applicable to the case of our Lucy, when she speaks of her black lover, that I am tempted, as well for that, as to show I have not forgotten my Latin, to repeat them.

*Ver erat, Zephyrus me conspexit, abibam*
*Insequitur, fugio, fortior ille fuit.*

What is there then but the love of the marvellous that should induce us to depart from the ordinary laws of nature to come at the conclusion, that this child belongs to a black, rather than to a white man? There was no difference but in the manner; and in such matters every man will have his way.

Dick can neatly dance a jig;
But Tom is best at Borees.

There remains but one topic of the evidence to discuss. Cases have been related and assented to by doctor Mitchill, that where there has been a rapid succession of intercourse between a white and a black man, twins have been born, each resembling the respective incumbent to whom he owes his origin. Upon this ground we are at length enabled to make a proposition which will meet the justice of the case, and of course

the approbation of the court. It appears here that there has been a rapid succession of intercourse in the very terms of the evidence; but of the twins only one is yet come to light, which is evidently that of the white man. The black man's twin is not yet born; but if the lady be as slow in bringing forth as she was quick in conceiving, it will be time enough two years hence to look for it. Let her satisfy the court that she has lived chaste since April, 1806, and will continue so to do for two years more, and then if there comes a black child *bona fide* the fruit of our connexion, we pledge ourselves to maintain it.

The mayor delivered the opinion of the court to the following effect:

This is an appeal from the police magistrates.—It appears that they were divided in opinion respecting the charging the defendant as the father of an illegitimate child, and that the commissioners of the Almshouse and Bridewell, acting as overseeers of the poor, have applied to the Sessions to review the case.

The defendant is a negro—the mother a mulattress—and the child has the hair and most of the features of a white, the colour, indeed, somewhat darker, but lighter than most of the generality of mulattoes.

The oath of the woman is positive as to the father; and it is not pretended by the defendant that he has not been connected with her; but he relies upon the appearance of the child to destroy the evidence of the mother.

This case, involving a most important question in physiology, the most respectable medical gentlemen in the city have been called in to give their opinions, and they almost unanimously declare that the defendant is not the father of the child, as it would be a deviation from the course of nature. Doctor Pascalis has fortified his opinion by some very able remarks; and sir James Jay, a physician of great respectability, and of the longest standing in the city, has given a decided opinion to the same effect, and has particularly indicated the want of crisped hair as a conclusive circumstance

NEW-YORK,
1808.

Commission-
ers of the
Almshouse
v
Whistelo.

against the testimony of the woman ; and he has been supported in his opinion by the president of the Medical Society, and several professors and other distinguished physicians.

The only opinion which militates against the united voice of the profession is that of doctor Mitchill, and this is more in appearance than in reality. That learned gentleman has explicitly admitted that the offspring of the mother and the defendant would, according to the ordinary laws of nature, possess a colour lighter than that of the father, and darker than that of the mother; and that, on the presumption of their being the parents, the appearance of the present child would be an anamoly in the science of man, and a departure from the usual operations of nature.

If, therefore, nothing farther appeared before the court, we would not hesitate to decide against the appellants ; as we undoubtedly repose less confidence in the oath of the woman, than in the opinions of the medical gentlemen who have appeared here as witnesses, corroborated by every appearance, and by our own observations ; and it cannot certainly be expected that we would have recourse to the miraculous to bear out and support the testimony of the mother. The rule in dramatic poetry will apply to cases of this nature—

Nic Deus intersit nisi dignius vindice nodus,
Inciderit————

But the mother has reluctantly attested, and explicitly admitted, that she had connexion with a white man as well as with the defendant. We can, therefore, even upon her own testimony, be justified in dismissing the present complaint ; and we accordingly order, that the application to charge the defendant as the father of the illegitimate child be over-ruled, and that he be discharged from his recognizance.